# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHRISTOPHER SMITH,**
    Petitioner,

 v.                 Case No. 11-C-0255

**MICHAEL BAENEN, Warden,**
**Green Bay Correctional Institution,**
    Respondent.

## DECISION AND ORDER

  Christopher Smith has filed a habeas petition pursuant to 28 U.S.C. § 2254. He was convicted in Milwaukee County Circuit Court of three counts of first degree intentional homicide and one count of felon in possession of a firearm. He was sentenced to three consecutive life sentences without eligibility for extended supervision for the homicides and a concurrent 10-year sentence for possession of the firearm. In his petition, Smith alleges that the state courts deprived him of due process by not affording him a new trial based on newly discovered evidence. He also alleges that, to the extent that the newly discovered evidence should have been discovered before trial, his trial counsel was ineffective in failing to discover it.

## I. BACKGROUND

  On August 20, 2005, Armando Pena, Roberto Vela and Daniel Vela were shot and killed at a Milwaukee tavern. The Velas were shot in the tavern's bathroom and Pena was shot on the sidewalk in front of the tavern. Numerous witnesses testified against Smith. Some of them identified Smith as the shooter, while others who did not actually see the shots being fired testified to facts that gave rise to a compelling inference that Smith was

the shooter. The Wisconsin Court of Appeals summarized the testimony of these witnesses as follows:

- Jesse Flores, a cousin of two of the victims, was at the tavern. He saw Smith and Roberto Vela argue but appear to settle their differences by drinking shots together. Shortly thereafter, Flores heard four or five gunshots coming from the rear of the tavern, and he saw Pena running toward the front door of the tavern. Flores saw Smith with a gun chasing Pena out of the bar. Flores heard Smith say something to the effect of "what now mother fucker" while chasing Pena. Flores ran out the back door of the tavern and saw Smith, another man, and a woman running down the alley. Flores saw Roberto Vela and Daniel Vela shot in the bathroom and Pena shot to death outside the front door. Flores had no question that Smith was the person he saw chasing Pena out the door with a gun.

- Christina Manvilla was at the tavern. She knew the victims and Flores for several years. She saw Smith and the Velas look like they were going to get into a fight. A short time later, the Velas went into the bathroom, and Smith followed them. Manvilla heard gunshots coming from the bathroom. Smith came out of the bathroom, holding a gun. Smith pointed the gun at Pena and said, "you're next motherfucker." Pena ran out the door, and Smith followed him. Manvilla saw Smith fire his gun at Pena. She went into the bathroom and saw that the Velas were both shot. Manvilla testified that she had a good look at Smith that night, and there was "no question" in her mind that Smith was the person she saw shooting Pena.

- James Brienzo, who did not know Smith or any of the victims, was also at the tavern. Brienzo played pool with Smith. Brienzo saw two men walk into the bathroom, followed shortly by Smith. Brienzo then heard gunshots and saw Smith leave the bathroom. Brienzo was standing near the bathroom, and as Smith walked past, he pointed his gun at Brienzo and asked him if he "had a problem" or if he "wanted some too." Smith then walked toward the front of the tavern, and another man ran toward the front door. Brienzo then heard more shots. After the shooting, Brienzo was in the back alley when Smith walked by. Smith again pointed his gun at Brienzo and asked if he "want[ed] some." Brienzo believed that the two men who were shot in the bathroom were the two men who went into the bathroom just before Smith entered it.

- Lamonte Barfoot was working security at the tavern on the night of the shootings. Barfoot broke up an argument between two Hispanic men

and Smith by telling them to "chill out." Barfoot later saw the men having drinks together. About forty-five to sixty minutes later, Barfoot heard gunshots coming from the rear of the tavern. He ran to the area and saw Smith come out of the bathroom with a gun in his hand. Smith pointed the gun at Barfoot and asked, "you want some next?" Barfoot put his hands up and dove into the women's bathroom. He then heard shots coming from the front of the tavern. After the shooting, Barfoot went into the alley and saw Smith running through the alley. Barfoot saw two gunshot victims in the bathroom and one victim on the sidewalk outside the front door.

- Dennis Wappes also did not know Smith or the victims. About 12:30 a.m., Wappes heard "what sounded like someone had a hammer and was banging on the walls in the bathroom." People began running for the doors. Wappes saw a Hispanic man running as fast as he could toward the door and Smith chasing the man out the door. Smith had a gun in his hand, extended straight out, and pointed at the man's head. As the Hispanic man exited the tavern, Wappes heard a gunshot. Wappes testified there was absolutely no doubt that Smith was the man with the gun chasing the Hispanic man out of the bar.

- Lorene Gross went to the tavern with a group of people to celebrate her birthday. Gross knew Smith who was also at the tavern that night. Smith got into an argument with some men and Gross told him to "[j]ust leave it alone." Smith replied that he was not going to leave it alone. A woman named Cueryn was in Gross's group. At some point during the evening, Cueryn left the tavern and returned about thirty to forty minutes later. When Gross was getting ready to leave, she heard gunshots. Gross got under a table and heard another gunshot. Gross heard Smith say, "[w]e're coming for you, don't run" and heard a woman named Laurie tell Smith, "German, no." Gross testified that "German" was Smith's nickname. Gross then went out the back door of the tavern and saw someone who she thought was Smith walking down the alley with a gun. Later, Gross went to a friend's house where she saw Smith again, shaving his head.

- Trinidad Santos went to the tavern with Smith and others to celebrate Gross's birthday. While there, her boyfriend, Lupe, got into an argument with Pena, but the dispute broke up quickly. Shortly before 1:00 a.m., Santos heard gunshots coming from the men's bathroom. She then saw Smith, with a gun in his hand, chasing Pena toward the front door of the tavern. Santos yelled, "German, what the fuck." Santos then heard another shot. Santos left the tavern after the shooting. When she got to her house, about four blocks away, Smith was on the porch. She let Smith use her bathroom. Other people

3

- arrived at the house, and Santos and Lupe left. When she returned home early the next morning, Smith, who had shaved his head, was asleep in a bedroom with Cueryn. Santos fell asleep, and when she woke up, Smith was gone.

- Cueryn Wiorek went to the tavern to celebrate Gross's birthday. She had gone out with Smith previously and wanted to date him. About an hour or two after she got to the tavern, a man from her group got into an argument with a man from another group. The argument seemed to settle down. Smith then asked her to go to his house and into his "top dresser drawer to get the first thing, get the second thing, put it together and bring it back." Wiorek drove to Smith's house, opened his top dresser drawer and retrieved a gun and ammunition clip. Wiorek put the clip into the gun, put it under the seat of her car, and drove back to the tavern. When she got back to the tavern, Smith held out his hand. She assumed that Smith wanted the gun, and she told him it was in her car if he wanted it. Smith then left the tavern. A short time later, Wiorek heard four or five gunshots and saw Smith come out of the bathroom. Eventually, Wiorek left the tavern with two other people. As they were driving, they saw Smith walking, picked him up, and drove to a house. Inside the house, Smith admitted that he had "killed those people." Smith went into the bathroom and shaved his head. He took a butcher knife from the kitchen and put it in his pants. Smith apologized to Wiorek for putting her through this and said that he "did it" for his friend, Lupe. A day or two later, Smith called Wiorek and again apologized. He called again later and told her that he was trying to cross the border and needed to learn to speak Spanish. He also told Wiorek that he needed his birth certificate and wanted her to get it for him.

State v. Smith, No. 2008AP2178-CR, 2009 WL 3085189, at *5–6 (Wis. Ct. App. Sept. 29, 2009).

After the jury found him guilty, Smith filed a post-conviction motion in the trial court for a new trial based on newly discovered evidence. The Wisconsin Court of Appeals described this allegedly new evidence as follows:

> Smith filed a postconviction motion for a new trial based on newly-discovered evidence. The motion was accompanied by a report of a private investigator. The report identified three persons—William Ramos, Guillermina Rodriguez, and Annette Martinez—who gave statements to police but did not testify at trial. According to the report, Ramos told police

4

he lived near the tavern and was watching the commotion outside the tavern after the shooting. The intersection near the tavern was wrapped in crime scene tape. Ramos told police that, about thirty minutes after the shooting, a car containing three or four girls parked, and the girls tried to enter the crime scene. Police turned them away, and the girls then walked across the street and watched the crime scene. Ramos told police that another girl then emerged from the alley behind the tavern, and one of the girls from the car began yelling, "It was your brother who killed him. He did this." The investigative report states that neither of Smith's sisters was in the area of the tavern on the night of the shootings. Ramos was not called to testify at trial.

Rodriguez is Ramos's mother, and according to the report, she gave a similar statement to police after the shootings. Rodriguez was not called to testify at trial.

Martinez also gave a statement to police of the night of the shootings. Martinez was in the tavern, and she told police that she saw the shooter as he came out of the bathroom. Martinez told police that the shooter had acne on his face. Martinez was not called to testify at trial. Martinez later told Smith's private investigator that the shooter had a tattoo on his neck. Smith's booking photo showed neither acne scars or neck tattoos.

The report also stated that Martinez was shown a seven-person photo array of suspects that included Smith's photograph. Martinez identified a photograph of a Christopher Sandy as the shooter. Martinez was then shown a photograph of Smith, and Martinez told the private investigator that she did not recognize the man in that picture.

Id. at *1.

In his post-trial motion, Smith also raised a claim of ineffective assistance of trial counsel. He argued that to the extent the court concluded that Smith should have discovered the testimony of Ramos, Rodriguez and Martinez before trial, his failure to do so was the result of his trial counsel's failure to conduct an adequate investigation.

The state trial court denied Smith's post-conviction motion without holding an evidentiary hearing. The court reasoned that even if the allegedly new evidence had been presented at trial, it would not have resulted in a different verdict because the evidence of

5

Smith's guilt was "overwhelming." As to the claim of ineffective assistance of trial counsel, the court concluded that, because the allegedly new evidence would not have made a difference in the outcome of the trial, Smith's counsel's alleged error in failing to investigate could not have been prejudicial.

Smith appealed to the Wisconsin Court of Appeals. He did not raise his claim of ineffective assistance of trial counsel, and so the court concluded that he had abandoned that claim. As to the motion for a new trial based on newly discovered evidence, the court concluded that most of the cited evidence was not "new" because it had been disclosed in the pretrial discovery materials. As for the remaining evidence—which consisted of Martinez's identification of Sandy as the shooter—the court found that it was not enough to outweigh the testimony of the other witnesses who identified Smith as the shooter, and that therefore it did not create a reasonable probability of a different result.

Smith unsuccessfully sought review in the Wisconsin Supreme Court and then commenced the present habeas action.

## II.  DISCUSSION

Under 28 U.S.C. § 2254(d), a federal court may grant habeas relief on a claim that was "adjudicated on the merits" in state court only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Smith argues that his due-process claim was not adjudicated on the merits in state court. However, the Wisconsin Court of Appeals discussed Smith's newly discovered evidence and concluded that it either did not qualify as "new" evidence or was not so compelling that it raised a reasonable probability that he might have been acquitted. That was an adjudication on the merits. Smith argues that the state court's conclusion that he was not entitled to an evidentiary hearing on this claim turned the decision into a resolution on procedural grounds rather than on the merits. It did not. The state court's conclusion that Smith was not entitled to an evidentiary hearing was based on its view of the merits of the claim. The court reasoned that because the record conclusively established that Smith was not entitled to a new trial, holding an evidentiary hearing would have been pointless. Smith, 2009 WL 3085189, at *7 n.7. Thus, the state court adjudicated the due-process claim on the merits, and § 2254(d) applies.

Because § 2254(d) applies, Smith can obtain habeas relief only if he can point to a decision of the Supreme Court of the United States that the Wisconsin Court of Appeals misapplied. However, Smith has pointed to no Supreme Court case that recognizes a due-process right to a new trial based on newly discovered evidence. Nevertheless, I will assume for the sake of argument that if newly discovered evidence pertaining to a person's actual innocence is extremely compelling, it would be a violation of the principle of fundamental fairness embodied in the Due Process Clause to not afford that person a new trial in which the evidence could be considered. See Moore v. Casperson, 345 F.3d 474, 491 (7th Cir. 2003). In the present case, however, the evidence of Smith's innocence is not compelling.

As summarized above, the state presented testimony from eight witnesses who either saw Smith shoot the victims or testified to facts that left little doubt that Smith was the shooter. Against this, Smith offers (1) the statements of the two witnesses who saw one girl yell "your brother did this" at another girl while they were standing outside the tavern after the shooting and (2) the statements of Martinez involving the neck tattoos, acne and identification of Sandy as the shooter. The statements about the girls in front of the tavern have little value because they establish that the girl who yelled "your brother did this" did not even arrive at the crime scene until thirty minutes after the shooting occurred. Thus, that girl was not in a position to know who committed the homicides and, most likely, was simply jumping to a conclusion. Although Martinez's statements are more favorable to Smith, they are simply not enough to cast doubt on the eyewitness testimony of eight other witnesses. Thus, Smith is not entitled to habeas relief on his due-process claim.

Respondent argues that Smith procedurally defaulted his ineffective-assistance-of-trial-counsel claim by failing to raise it in the Wisconsin Court of Appeals. When a state court resolves a claim on the basis of an adequate and independent procedural ground, federal habeas review is at an end unless a petitioner can show cause for the default and prejudice attributable thereto. Johnson v. Thurmer, 624 F.3d 786, 789 (7th Cir. 2010). A state procedural ground is independent if it was expressly relied on by the state court in rejecting the claim, and it is adequate if it is a clearly established and consistently followed state practice at the time it is applied. Id. Procedure applied in an unprincipled, inconsistent, or freakish manner is inadequate and will not preclude federal habeas review. Id.

8

In the present case, the Wisconsin Court of Appeals rejected Smith's ineffective-assistance claim on a state procedural ground: abandonment of the claim by failing to raise it on appeal. See Smith, 2009 WL 3085189, at *1 n.2. Smith does not dispute that the abandonment rule was clearly established and consistently followed. Instead, he argues that he was not required to raise his ineffective-assistance claim on appeal because it was only an alternative ground for relief. This argument makes little sense. The trial court rejected Smith's ineffective-assistance claim on the merits, and if Smith wanted to preserve that claim as a backup to his due-process claim he was required to contest the trial court's rejection of that claim on appeal. He did not, and therefore he forfeited further review of that claim. See Durand Cooperatives v. Emmert, No. 97-1241, 1997 WL 519905, at *2 (Wis. Ct. App. Aug. 26, 1997) (finding that alternative theories of recovery were abandoned because they were not raised on appeal).

A procedural default will bar federal habeas relief unless the petitioner can demonstrate both cause for and prejudice stemming from that default, or that the denial of relief will result in a miscarriage of justice. Lewis v. Sternes, 390 F.3d 1019, 1026 (7th Cir. 2004). In the present case, Smith does not attempt to show cause or prejudice or that the denial of relief will result in a miscarriage of justice.

Although Smith's ineffective-assistance claim has been defaulted, I note that it would have failed on the merits anyway. This is because, even assuming that trial counsel was deficient in failing to discover the allegedly "new" evidence, the discovery of that evidence would not have given rise to a reasonable probability that the outcome of the trial would have been different. See Strickland v. Washington, 466 U.S. 668, 694 (1984). As discussed in connection with Smith's due-process claim, the allegedly new evidence was

simply not compelling enough to create reasonable doubt in light of the overwhelming other evidence of his guilt.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 7th day of March, 2012.

s/_____
LYNN ADELMAN
District Judge